Are you prepared to hear Holloman v. Markowski? Good morning and may it please the Court. My name is Stephen Braga and I am pleased to be here today representing Marcella Holloman in this case out of the United States District Court for the District of Maryland sitting in Baltimore. This case is a tragedy on all sides, Your Honors. A mother calls 911 in Baltimore seeking assistance to transport her mentally ill son to a hospital for medication. Two fully armed, uniformed Baltimore police officers respond to that call and within a minute thereafter a struggle ensues and the mother's son is shot fatally. Within a minute. Roughly the time that I've been at this podium so far, this entire chain of events raveled or unraveled. What's at issue in this case, Your Honor, is the slog through the morass of factual reasonableness that this Court has recognized repeatedly, the Supreme Court has recognized repeatedly in an excessive force case, objective reasonableness is a test. And it's a particularly fact-bound inquiry. Judge Wilkinson, your separate opinion in a State of Armstrong makes that very, very clear. Judge Motz's opinion in Clem v. Carbo, I haven't found an opinion yet by Judge Harris in the subject matter area, but I'm sure it would be detailed as well. The facts matter here. And the difficulty, our primary difficulty on appeal is that the facts were not developed enough to warrant summary judgment for the defendant officers. Your Honor, on the first question, I, of course, agree with you that the facts matter. But we do have to take the record as it was before the District Court. And the District Court, right at the outset of the opinion, says, I'm only going to proceed. All my opinion is based on two things. One is the Heilman statement, and the other is the amended complaint. And then when you read through her opinion, all the citations seem to be either to the amended complaint or to the Heilman statement. And, you know, it's not often that any discrepancy between someone's pleading and someone's motion creates an issue of triable fact, and there doesn't seem to be much discrepancy, too much discrepancy here. But in other words, I'm just not sure it's all that easy to draw an issue of triable fact when you have a district judge that is predicating her ruling on a plaintiff's own document, plaintiff's own complaint, and on the plaintiff's own statement, and then on the fact that there was no opposition filed to the motion for summary judgment. In other words, when you look at the record as the district court was required to and that the district court had in making the ruling, it's pretty tough for you, isn't it? Your Honor, I don't think it is, and here's why. So there are only two pieces of this record, Your Honor has identified them. The amended complaint filed by Ms. Heilman, pro se, doing the best she can as a pro se litigant in the district court. Her pleadings are entitled to liberal interpretation, of course, under this Court's precedence. And the transcript of her interview. Now, the transcript of her interview, Your Honor suggested in your question, Judge Wilkinson, that it would be a rare case where a party's pleadings and a party's statements might be at variance. They are at variance here. You can't create an issue of material fact by arguing with yourself. There's one book law on that. No, understood. But what I'm trying to suggest is our point in the brief is that her transcribed interview shouldn't have been relied upon as true by the district court. And when you look at the district court's two opinions on the motion to dismiss, the factual portion in the joint appendix is plain vanilla. It relies on the amended complaint allegations only. When you look at the decision on the motion for summary judgment, the factual allegations are much more detailed, because it relies on the transcribed statement in addition. And we've cited in our briefs the court's decision in Goins v. Valleywood, Judge Wilkinson was on the panel, where Judge Traxtor wrote an opinion talking about when you're trying to use a party's statement against them in this kind of setting, a motion to dismiss, or in this case, a motion for summary judgment with one document, you have to look at where that statement comes from. And this transcribed statement was given less than an hour after- It was recorded, was it not? Given less than an hour after her son's death, she was taken down to the police station without a lawyer. And if you read the transcript, and it's in the joint appendix, of course, I think pages 263 on, you can see it's almost a rambling recitation of everything that's running through her mind. The transcript is a sort of, it's a classic document that appears, you know, it's the very kind of thing on which summary judgments are granted. You know, affidavits, depositions, responses to interrogatories, transcripts of this nature. I mean, what was, I don't understand what the district court was supposed to do when there was no opposition filed to the motion for summary judgment. And when, so they said, okay, there's no opposition to that motion, and so the transcript is here, and it was given an hour after the interview, and it's probably the most immediate recollection. Immediately, it was given under conditions of stress, I'm sure. But it's the best she had to go on. And, I mean, I guess I'm just in a situation trying to place myself in the shoes of the district court and saying, you know, this is a record before me. I'm going to rely on plaintiff's own statements. Right, and there's two responses to that, Your Honor. The first is, as Judge Mott said, she can't create a terrible issue by disputing herself. But there are different things in the amended complaint and the transcript. They're not always in conflict, and the district court noted that in her footnote, too. And some of the allegations in the amended complaint are helpful to the finding that this was not an objectively reasonable use of excessive force. That's the second point. That's the ultimate question the district court had to decide. I'm stuck with this weak record. I admit in footnote one of my opinion, it's sparse. I've got what I've got. But can I tell from even this weak record that it's so clear on the peculiar facts and circumstances, this, you know, granular inquiry we've got to make under objective reasonableness to determine excessive force. Can I tell even with this record that this is summary judgment, the use of excessive force was reasonable? Judge Blake said, you know, to get to trial, you've got to have a genuine dispute of material fact, and when you look at the material facts, there's a history of violent conduct, which leads to the 9-1-1 call, and when the officers arrive, he's either punched or attempted to be punched, and then he is on top of Officer Murkowski, and then apparently at that point, Bragg perceives his colleague to be in imminent danger from a person whose violent propensities were amply demonstrated and shoots. And so there's an imminent threat of serious danger, and those are the material facts. I mean, you can quibble with one of those, but that's the sequence, isn't it? That's the sequence, and those are some of the material facts related to the Graham versus Conner factors. The factor that's not been analyzed properly here, two factors. One is the proportionality. In a state of Armstrong, this court recognized that the proportionality of the use of force has to be dealt with, too. This man was unarmed. This man was 5'11", 165 pounds. There were two fully armed Baltimore police officers. It is true that when he entered the house, the police officers grabbed him first. He didn't initiate the contact. They each tried to grab an arm and hold him, and he broke free. It is true that a struggle broke out next, and there was a punch thrown, unclear in the record who threw what punch to who. And it is clear, as Your Honor pointed out, that Officer Markowski then ended up pinned on the floor. What happens thereafter is entirely unclear because the officers have never given any testimony. They've been handled very well by their defense counsel. They've tried to avoid discovery, and they've avoided it. But what happens next is huge in terms of proportionality of the force used. It can't be that every time somebody punches a police officer, a police officer can pull his gun out and shoot them. It can't be that every time a police officer is pinned with a helpful officer next door or nearby, that a police officer can pull out his gun and shoot them. I understand that we're not to engage in 20-20 hindsight, and these are split-second judgments, but the split-second judgments rule works both ways. And so while you might say in a split-second judgment, Officer Markowski decided to fire his gun because he feared for his life, and Markowski fired first, Your Honor, not Officer Bragg, according to the facts as we know it, then when does Officer Bragg fire his shot? Two shots from Markowski into the chest, a shot by Bragg into the back. If Bragg fires second, why? What happened? We don't know. This Court's precedent, Streeter v. Wilson, talks about if there's a pause of two to three seconds between shots, then the officer has to evaluate again in a split second, is my shot necessary? And what the district court never did here was analyze the different shots, and that has to be done as well. Do you have a question, Your Honor? Um, I wasn't trying to express a question, but I do have a question. Um, I understand what you're saying to be, in part at least, it can't be the case that every time an officer is sort of on the losing end of a kind of physical altercation, you can use the officer. It's reasonable to use deadly force. But I did understand the district court as issuing, as confining its holding more narrowly, that it wasn't just the fact of the physical altercation. It was all those background facts that my colleague just sort of listed out, that there was this very recent history of kind of violent misconduct in the home, that there were other people on the premises whose safety was at risk, that there was a lot going on here beyond just the one physical altercation. Well, this, so this, this gets into a little bit of an issue in the circuit in a case called Greenidge v. Ruffin, where the question was whether you, how far back in time do you go to evaluate the reasonableness of the officer's position? In Ruffin, prostitution arrest, officer opens the car door, tells the, John and the woman to put up their hands, the John refuses to, reaches behind the seat, the officer shoots him. The officer shoots him because she thinks he's reaching for a weapon. In fact, he's reaching for a billy club. This Court said, we're not going to go way back into the officer's pre-opening that door activities, but we are going to start the analysis when the door opens. So. I think that's a slightly different kind of a context, because the question here is, at the moment deadly force was used, I'm agreeing with your framework, you look at that moment, could a reasonable officer, given what that officer knows, have believed that there was a real threat of physical injury here? And I think when we ask that question, we do ask about the sum total of what the officer knows. And, and so, so in Ruffin, you would then go with when the door opened. But understand the background context, because Officer Markowski had heard some of these things from Ms. Holloman on his way into the house for sure. And he's allowed to take those into account. I think that makes sense. But he didn't hear that anybody was hurt. At the most he heard that the sister and Maurice had a scuffle upstairs and the sister came down uninjured. Neither of these officers, at least as far as the record can tell, sustained any injuries. We don't have any record of any injuries. They have a, they're hearing that a person has gone off his medication. A person with bipolar has gone off his medication and he's doing some wacky things. He's busting televisions. He's trying to rip off doors. He is acting out violently. But is he acting out violently in a way that threatens such a serious risk of harm to the officer that he can shoot him? I mean, he doesn't have a weapon. He's unarmed. And I'll tell you, in all my research and the law students did the research on this case, I... Couldn't he have been strangled or choked? Or couldn't Mr. Johnson have gone for his weapon? Mr. Johnson didn't have a weapon by any account. He could have tried to get Officer Markowski's. There's nothing in the record about that. There's also things that are... Couldn't he have been choked or strangled? I mean, this is... And anything could have happened, Your Honor. And if we're going to go that far down the line, then anytime there's a physical encounter between a suspect and an officer, then lethal force would be justified because he could have reached out and choked him. He could have done this. He could have done that. You're saying anytime, anytime this, anytime that. But you began your whole argument by saying that this was all, all of these cases are very fact-specific. So I don't understand from the review of a very fact-specific case how we would be saying anytime anything happened, all of these cases are very, very fact-bound. They are. And I think that the failure of the district court here is to recognize that she had a different option. The option was to say, I can't grant summary judgment. The facts aren't developed enough. I want these facts more developed. I want to know from the officers what their positions were. I want to hear their testimony. Of course, if Ms. Holloman had a lawyer, she would have taken their depositions. I want Ms. Holloman to be deposed, the district court could have said, and compare her transcript to her amended complaint allegations. We don't even know on this record what the size of the officers were. Would it make a difference if they were six foot eight, the size of professional linebackers, and Mr. Maurice Johnson was 5'11 and 160 pounds? It seems to. Do we know, I thought, did the district court say that the second officer, I'm sorry, I can't remember the names, but that the second officer tried to pull Mr. Holloman off and was unable to do so? Yes, that is in the record. If we know that, that he wasn't big enough to get him off, does it really matter? Well, again, we don't know why he couldn't get him off. We don't know how he tried. We don't know that he wasn't big enough. Johnson wouldn't stop, as your client said, and instead dragged the group through the kitchen, living room, and into the dining room. Right. But wouldn't stop what, Judge Motz? It's not, wouldn't stop trying to kill Officer Murkowski, trying to stop getting out of the hold of the officers who reached out and grabbed him when he came in the door, trying to stop being arrested. For sure, he was trying to stop that. Why don't you take some of this up on rebuttal, would you, sir? I will. Thank you very much, Your Honors. Mr. Smolkin. Thank you, Your Honors. Good morning still, and may it please the Court. My name is Fred Smolkin on behalf of Officers Paul Murkowski and Gregory Bragg. I'll be arguing issue one of the appeal on the use of force. My colleague, William Phelan, will be arguing issue two. I would ask for 10 minutes to be reserved for him. Your Honors, there was no genuine dispute of material fact in this case, as I think the questions from the bench have already pointed out. We know what happened, and the question of what would happen next in the split second that counsel tries to freeze frame this and do the sort of Monday morning quarterbacking and 2020 hindsight that's prohibited under Elliott and Graham. In that moment, Phelan tries to cast this as a, as a slow development of events, or there was time to pause and consider what would have happened next. They didn't need to wait to see what happened next. The officers were justified in acting when there is a threat. From Elliott, we know that we do not have to wait until a defendant shoots, or a suspect shoots their gun, and what would have happened next, we get a pretty clear idea, Your Honor. But isn't it a little different if the suspect has a gun?  If you're dealing with an armed suspect, you can't be messing around, but, but I mean, this is an unarmed suspect. Is it your position that any time an unarmed suspect resists arrest in a physical way, the police are free to use deadly force? That's not our position at all, Your Honor. Your, our position is that when an officer is pinned to the ground by an assailant that cannot be removed by two officers who are, who are, they're trained in emergency response, trained in self-defense, here was a person who was acting without the ability to control the situation by the officers. See, can I, I feel like this case is so much harder than it has to be because we don't have the officer's affidavits. An officer affidavit saying, look, we tried to get him off and we couldn't, would be enormously helpful. Why do we not have that in the record? Your Honor, the, the trial counsel wanted to avoid the kind of protracted discovery dispute that often occurs in these cases. They looked at the, the factual allegations in the pleadings. They looked at the, the testimony. I apologize, the statement that Ms. Holloman gave to police officers contemporaneously with the event. It was not interrogation. It was her own statement recorded and transcribed contemporaneously. She had every chance to rebut that. Nothing that is a material fact is rebutted in the record or was rebutted during trial. Material facts are that the officers arrived at the scene. They saw a mattress that had been destroyed in the process of a violent outburst. They came in, they found Ms. Holloman herself and her daughter. They saw Mr. Johnson outside kicking on the door. I would, I would admit that the one piece of evidence that seems to be somewhat disputed and I would call it artfully pleaded is that kicking and the words kicking the hell out of the door were used in her statement to police. That becomes knocking on the door, but you're still left with a, a call to police, a request that they use their taser because Mr. Johnson wouldn't stop. That fact is actually doubled down on in appellant's motion for summary judgment, or I apologize for opposition to the motion for summary judgment. So between the obvious signs of physical violence in the house, the fact that she's barricaded herself inside to protect herself from, from the, from her son, this all leads to the indication that they were dealing with a person who was mentally unstable and violent in that situation, that he was not going to stop. Now, the urging at the scene was to tase the, tase Mr. Johnson, our officers decided that was not the proper course of action. At the beginning, they attempted to control the situation using manual restraint. Mr. Johnson broke free immediately from that manual restraint and turned the tables on the officers, putting them in a terrible situation where officer Markowski was pinned to the ground and Johnson was still continuing to punch and lunge at them and fight them off. That's another point that's not disputed in the record that he was lunging and punching them and was able to resist their attempts to control the situation. That leads to a situation that is very similar to what we had in Jackson. Jackson, the facts developed further the, the officer was not able to control the situation as well as our officers were in Jackson. It led to actual punching, actual strangulation and actual reach for the not by the actual use of force against them, but by the serious and imminent threat of serious bodily injury. Can I ask you a question about the case law? I'm sort of putting to one side to the, to the degree of the case law is uncertain about this. If there's a gap in the case, I totally understand that as far as qualified immunity goes. Um, that's not really a problem for you, but on the merits, I mean, I looked, were you able to find a case that approves on the merits, the use of deadly force when there's not, you know, when the suspect is unarmed and there's no, the officers have not put in an affidavit saying he was reaching for my weapon. He had his hands on my throat, you know, where all we know is there was a physical altercation and for sure the officer was on the losing end of it, at least momentarily. But is there a case like that where on the merits a court has said, um, deadly force is an objectively reasonable response? Cause I couldn't find one. Your Honor, the answer is no, we have not found one. The closest that we have is, is Jackson. Again, the, the confluence of Jackson and the case law saying that the officers do not have to wait for an actual attack to happen. Once an officer is pinned on the ground, there was an immediate threat of serious bodily injury. All of those cases about you don't have to wait, those are all armed suspects, right? Uh, this is correct, Your Honor. But, uh, I really, I totally understand. I want to be clear about this. If the case law is uncertain of qualified immunity, that's a win for you. But I really am trying to figure out on the merits, if we've got anything quite like this. Uh, Your Honor, not exactly on point. On the, on the question of whether it's objectively reasonable to use this amount of force. Uh, but our position, of course, is that it is, we have a situation, we know from the record that our officer is prone on the ground, that he's, uh, he cannot free himself, that the other officer who's assisting him cannot free him either. And that the next step would have been a serious bodily injury to our officer. That is clear from the record. Uh, if it's not clear from the record, at least a threat of that was clear from the record. The threat is what is justifying the use of deadly force under existing case law. That's Graham and Elliott and their progeny. Um, Your Honor, the last thing I wanted to take into, uh, take a note of was that, um, I guess going back to, uh, one of my colleagues original questions to you, even if we'd had the affidavit from the officers, they can't, they're not going to be able to manufacture a gun in his hands because there was no gun in his hands. Right? Correct. Your Honor. And again, that we would have, I mean, the facts aren't going to get any better for the police from their affidavits. I think it is strange that they didn't put their affidavits in. You said at the beginning that they wanted to avoid trial. Well, affidavits are, are fights about discovery. Affidavits, you know, don't, you can put them in, lawyer writes them, they put them in, they support motions for summary judgment. There is no trial. There is no discovery. That's correct. Your Honor. I, so I don't know that not putting in the affidavits avoided discovery. I can't second guess all of trial counsel's decisions. It was not my call, Your Honor. Uh, what I do know is that that would have possibly opened the door to discovery disputes and protracted at least the summary judgment. Of course, if, if we've actually thought that they're, they would disagree with what she said, then that suggests that maybe there is this disputed material fact here, and I would think that your position would be that they wouldn't have, they would have absolutely agreed with everything she said. They would have agreed to the extent that, that the facts were, uh, there and needed to be developed to dispose of this issue on summary judgment. I suppose the judgment was made, look, it's much more persuasive coming from her than it is from us. That is what I believe the trial counsel would have thought. And rather than put themselves out there, put a client statement out there to be attacked or assailed or second guessed, they relied on the plaintiff's own statements of fact, the plaintiff's own pleadings to draw down the facts of the situation to just those that were necessary for the court to make a determination on summary judgment. To see that the officers had objectively reasonable grounds and information and belief to know that Mr. Johnson presented a credible threat, a serious, uh, of serious bodily injury at the moment when they acted and that it all points up to that they had acted proportionately when they attempted to control the situation using manual restraint, that unfortunately failed and the tables were instantly turned. There was no time to second guess and no time to think or react. Officer Markowski was immediately on the ground and prone, uh, and subject to this serious bodily injury against which deadly force was an appropriate response. Uh, Your Honor, if there are no further questions, I'll yield the rest of my time to you, Mr. Phelan. Thank you, Mr. Small. Thank you. Mr. Phelan. Good morning, Your Honors. May it please the Court. I'm going to be addressing the question of whether the City of Baltimore, uh, which is forbidden by State law from becoming involved in the operation of the Baltimore Police Department, can be liable under, in a Monell claim, uh, under the actions of police officers. Uh, according to the Supreme Court in, in McMillian case and, uh, in St. Louis versus Propratnick, uh, the question of policymaking, who controls whom is to be answered by looking at State law and determining what the allocations of authority are between the, uh. Sorry, counsel. Can I ask you to address this consent decree issue? I mean, I'm looking at a consent decree where the City of Baltimore guarantees that it will change police procedures in Baltimore. How can they do that if they don't make policy that relates to the Baltimore Police Department? The consent decree is, uh. Does the Department of Justice know what's going on? Right. It's the United, I know at the top it says United States and the City of Baltimore or Mayor and City Council of Baltimore. It's signed by, it's signed for the City, it's signed for the, uh, United States and it's signed by the police commissioner. And of the provisions in there that parties are going to do things, um, almost all of those things are to be done by the police commissioner and the police department, uh, I think. It says the City commits to continue improving its policies, training, data collection and analysis to permit the assent of officer activity and ensure that officer's actions conform to the legal and constitutional requirements. The City commits to ensuring that input from community members and officers is considered in revising or implementing its policies and its training. And well, I think the only, well, from my point of view, the only, uh, interpretation or the best interpretation of that is that the City will do whatever it can do to make these things happen. But you may not know the answer to this question, but is it your understanding that that's what DOJ thought when it signed this, you know, City has no control. It'll do what it can, but to be clear, we can't do anything. I don't know, but I wasn't part of that case, but because the police commissioner signed that agreement, um, on the, I think the very last page, um, the police commissioner is the one who has the power to make that happen, really. I mean, the, the, the City cooperates. The Mayor and the City solicitor, right? I I've seen Baltimore and the City solicitor signed it for the City of Baltimore, the Baltimore police department also signed it, but why aren't the references in this agreement to what the City will do about what the City will do? Well, I don't know. Cause I, I wasn't part of that negotiation. And you represent the City in front of us. So you're supposed to know who, what the City is about. We, you know, we're climbing in the darkness down here in Richmond. We don't know what the Baltimore City government is about. Well, that's what I'll, I'll try to straighten out, but, oh, good. So you're going to, you're going to write us an additional letter telling us what the story is here. No, I'm not, Your Honor. I, I, Well, maybe, maybe that would be a good idea. Do we need to reach the questions if we find that there's no underlying constitutional violation on the excessive force claims? You do not, Your Honor. No, but if we find that the only way you win on the excessive force claims is through qualified immunity, we do, don't we? Right. The City's still out there then, if there's, right. But, so then we'd have to resolve the issue that you're arguing. Correct. So we would have to know what, what, what's what about this consent agreement? Well, what's what, I think, is State law. If the Supreme Court is saying, look at State law, and State law says that the, the State, the General Assembly created the police department as the State agency and allotted certain powers to the police commissioner, power to hire, fire, train, discipline, all the things that the City is being accused of not doing in the complaint. And this is a motion to dismiss case. So I think the focus should be on the complaint and what the allegations are there. But it was a summary judgment. It was a dismissal of the mayor. Okay. Right. And so the State gives all those powers to the police commissioner. And then, at the same time, in Article II of the City's charter, which is actually created by the General Assembly, that's the grant of powers to the City, it not only doesn't grant those powers to the City, but says to the City's officials, you can't, you can't do these things, you can't train police, you can't interfere with the powers that we have given to the police commissioner. And that's the state of the law in Maryland. And, and if that agreement disagrees with that, I don't, I think the law wins. And certainly if, certainly I'd like it a lot better if, if it had been the police police department and the United States, or a police commissioner in the United States. But, but the fact is- Just procedurally speaking, so if we were to rule for you on this point, it does seem that it would throw the consent decree into a lot of questions. So would we not want DOJ's views on this before we issued a ruling like that? I, well, I don't think that it would throw out the consent decree because- I don't think it would throw out, it would raise questions about the validity and implications in the consent decree if, if we then hand down a ruling saying they can't do that, they have no power. It would be acting ultra-virus. If, if they do something like that, yes. But I think the, the answer is that the police commissioner himself is, has signed this agreement, and so the person, the official with the power to make these things happen is, is part of the agreement, is part of the consent decree. And so there's, there's not really a problem with that, that the, the entity with the power to make this happen is not involved in the agreement. All the parts about the agreement that talk about what the police department will do, I agree with you. That's all still perfectly fine. But the parts that talk about what the city will do would be, you know, stricken if we ruled the way you want us to rule. And I just think before we did that, we would want maybe to hear what DOJ thought about what the agreement would be worth without the city. Well, Your Honor, I, I have not considered that, if the court rules in favor of us on this case, on this motion to dismiss, that that changes the agreement that's been made among the city and the United States and the police department. I think because the police commissioner is a signatory and has the power to do the things that need to be done. Regardless of how the relationship among the different entities shakes out, there's still the question of how did any policy of the city or the state or the police department or whatever caused what happened? Right. What you have is a single incident that unfolds in a nanosecond. And it's, it's, I don't know that the argument has been made that any one particular policy of, of, of one of these entities caused it. I just don't, don't know how, why this is the case for us to disentangle whatever the Maryland scheme might, might be. It seems a little odd to me, but, but I, I can't see that it figures in the, in the injury in any way. It probably, it probably doesn't. I mean, what, causation is a problem. And, and the lack of cause, causal connection. It hasn't been, it hasn't been pled or anything that a particular policy caused. But what happened here, I mean, this was something that just arose lickety-split, you know? That's correct. And the reason the police commissioner, why the case was dismissed as to the police commissioner, was that there was no, there was no connection, causal connection between the things that were alleged and what ultimately happened. So that's, that's a problem too. And, and that may be a problem that possibly sidesteps the. This police commissioner didn't come on board until what, six months after the shooting? Well, he was appointed and in August of 2012. So a couple of months after this incident, to, to come in and reform the, the, the police department. He was sworn in, confirmed by the city council and sworn in, in November. So that's, that's the gap. But he was actually on the job as of August. So we, well, I mean, our position, my position is the police commissioner is the one with the power. All the allegations in the complaint are, the city failed to train, the city failed to discipline, the city failed to fire people, all things that the city has no authority to do. And therefore, the city should not be able to be held liable for failing to do things that it has no power to do. And, and if there's a conflict with the, I don't think there is a conflict with the, the late relations between the city and the United States. And the police department, because the police commissioner and police department are, are signatories to that agreement. And so the entity with the power to make things happen is, is in the agreement and will have to make those things happen or, or there'll be problems. And the city is, the city is in for funding, you know, the city does fund the police department. But, but the actual things that are being alleged in this case are not a lack of funding or something like that. They're, they're training and things that are specifically given to the police commissioner. And I see I've passed the time. So if there are not any other questions, I will sit down. And if you have any further questions. We have no further questions. Thank you, Your Honor. Mr. Broder. Yes, thank you, Your Honor. Let me start with the state law question that just, just was dealt with by Mr. Phelan. You mean state law question, what? Whether the city is a suable entity under 1983, the issue just addressed by Mr. Phelan. So you cannot read the Department of Justice agreement and the Department of Justice report that we submitted as a supplemental authority. Without concluding that the city is the opposite party to that transaction to those events. Okay, I get you. That might be, that might be correct. But the, the question I have is, is how is this the case for, for arguing that? I mean, it, it, under Monell, you have to have a, number one, there has to be a policy. And number two, the policy has to have caused the unconstitutional deprivation. And I don't, you know, I, I don't see that, I don't see that here. I don't, I don't understand how a policy affected anything. Sure, Your Honor. So it, Monell was not ruled on below by the district court. Monell was not ruled on below. The district court got rid of the city on this ground that Mr. Phelan just argued. But Monell liability was pled on failure to train, failure to discipline, failure to supervise, in effect, deliberate indifference, which is a standard Monell theory of liability. Deliberate indifference is clearly pled. And if you look at the Department of Justice report, this exhaustive report we provided, it's, it fines, and it's a public report admissible under 8038. What cases are there that indicate that there is municipal liability for something that's, if it's assuming arguendo, that it's not a violation of the law? How, how can you hold a party in if the underlying act was a lawful one or within the boundaries of the law? I mean, I'm just not. You agree with that. Absolutely. There's no dispute that if you find this force was objectively reasonable, the city's out. Not, not if you find it's, the officers are free because of qualified immunity. Can you just talk about that a little bit more? That's, why is that? Because we'd be saying, look, there was no law on point one way or the other. So they're fine. So how is the city, what did the city, the city failed to instruct the officers on law that doesn't exist? Do you know what I'm saying? It, it, it goes, it, it's recognized in all the cases, Your Honor and Judge Harris, that qualified immunity does not get one out from Monell liability. Because the officers, you know, are entitled to their own immunity for all the reasons that we have immunity, but Monell is different. And it goes to Judge Wilkinson's causation point. And again, if you, if you look at the Department of Justice report, it finds a pattern of practice of use of excessive force. It finds a pattern and practice of use of excessive force against individuals with mental disabilities, our case. And it finds the officers are trained to aggressively escalate situations rather than de-escalate them. Causation can be proven in this case under Monell on the basis of what the Department of Justice has exhaustively concluded. Again, in a report that would be admissible in court under Rule 8038. So, so Monell and causation, I think, are, are still in play in this case. The, the big issue in this case, and Your Honor, Judge Harris, you're exactly right. Your research fortunately confirms mine or my law students that I have not found, we have not found a case anywhere that sanctions the use of lethal force when the person who is shot did not have a weapon or did not express a verbal threat or both to the police officers. It's not out there. This case is not covered. I realize that may be a problem for qualified immunity. It's kind of a wrinkly case. And Judge Wilkinson I know would agree with that. But this is not a proportional use of force. What policy are you talking about? In terms of Monell? Yeah. Yeah, the, the policies, well, there's, there's, as referenced in the Department of Justice report, there's apparently a policy of escalating aggressively encounters with citizens. There's a policy of not proper training, how to deal with mental disability suspects. There's a policy of excessive force. Yeah, but that, that, we're blowing this case up into something that's not. All of those, I don't understand how all of those, there may, there may well be cases in which those policies are implicated. But I don't see it under the, under the facts as they're elicited here. I mean, there, there are a whole lot of situations where I can see that the policy would, would, would be implicated, but what, what, what else could they do? Your Honor, I see that my time is up. May I respond? What would you have them do? Well, Your Honor, if, if you look to the, the types of patterns and practices I've just itemized from the Department of Justice report, it is this case. These officers came in, they escalated the situation with Maurice Johnson in a way that was improper for dealing with a mentally ill victim. And we see some of that in the cases this, this court has had. A state of Armstrong. That's so much, that's so much hindsight. I mean, you've got. Well. You're being punched. Except for the fact that the Department of Justice report goes from 2010 to 2016. Mr, Mr. Johnson is a victim right in the middle. It's not hindsight, Your Honor. It's real world. On the same question, if I may. So it's, it's your understanding that it doesn't really matter what the complaint says, because we have this separate DOJ report. Because just in looking at the complaint, I don't really see an adequate allegation under Monell either. I mean, it says, it lists a couple, it does. It lists, I think, ten cases where police officers shot people. But there are no facts from which you could infer that any of those shootings were unconstitutional. But, but you think it doesn't really matter what's in the complaint because the complaint sort of incorporates by reference the DOJ report? Well, well, the complaint is, is designed, as you know, under Iqbal to state a plausible claim for relief. And Judge Motch's decision in Owen, that we've cited in our brief. That's different because in Owens, they said that there were successful Brady motions, so there had actually been Brady violations. Right. So here we have shootings, but no, nothing in the complaint from which you could infer that any of them were unconstitutional. Well, the, all the facts of. I feel like if in Owens, they had just said, there's lots of requests for information. Well, I think when you, when you look at Owens really carefully, it says there had been motions and there had been successful motions. It didn't go into the particulars of all those Brady violations in Owens. There was an underlying Brady violation. Yes. No, no, absolutely. And, and so we still have to get to the underlying violation. In this case, it all comes down to proportionality, Your Honors. No, look, one thing that concerns me here, this is responding to calls of domestic abuse, excuse me, I've got a cramp, is it's not glamorous duty. And you hear complaints about the way police respond to 911 calls. You also hear complaints about the fact that the time of response to 911 calls in some locations is going, growing longer and longer. And these are questions that can turn on a dime. People are, they're furious at the police for intervening in a domestic quarrel. And these things are rife with danger. And yet it's essential that people feel threatened by a spouse be able to call on law enforcement. And I, and I wonder in this situation if, you know, we say, oh, well, it's, you're only protected by qualified immunity. But the next case you try to do this, it's, you know, you've, all bets are off. The, the, these are hard, hard cases. And I understand that this is a difficult situation for the plaintiff. But you don't want to disincentivize police officers from the situations in which the most vulnerable people need help. And, you know, here Mrs. Holloman needed help because the birthday party had just gone completely awry. And they even had to put the children in the car because of, and, and Mr. Johnson needed help. He needed, you know, he needed to get to a hospital and that's, those are situations in which people need help. And if, if we say there's some constitutional infraction here, you really disincentivize people answering 911 calls. They don't like to do it in many cases. You know, it's not what they necessarily want to do. And it, it is, it's, it's very volatile. And I just hear, you know, saying, all right, the courts are going to give us a lawsuit when we try to protect their own lives and those of our colleagues. We just let them cool their heels when the next 911 call comes through. And that's not, this is a, the whole area of domestic abuse is a terrible problem. And I, and I honestly, gosh, I worry about a case like this making it worse. It's a understandable concern, Your Honor. It's why the doctrine of qualified immunity was invented, of course. Again, the law, the case law builds incrementally on the facts. The facts are so key here. Look at what's happened in this case on the facts. The police rushed Ms. Holloman down to the station less than an hour after her son's murder took her statement, but yet they refused to give their own statements about what happened. We're told today that they decided not to tase because they thought that would be ineffective. We don't know that. There's nothing in the record of that. We're told that they might agree with everything Ms. Holloman said. We don't know that. We should know the facts. The facts are going to drive the decision. This was not a proportional use of force. Thank you. Thank you, Mr. Braga. And I also see that you're court assigned and I do appreciate your very able argument. Thank you so much.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Pamela A. Harris